IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WELTON JAMES WATSON II                                                    PLAINTIFF

v.                          Civil No.   4:12-cv-04028

SHERIFF RON STOVALL, Miller County
Sheriff; WILLIAM FLOYD, Maintenance Supervisor,
Miller County Detention Center; MARTY
BRAZELL, Jail Administrator, Miller County
Detention Center; NADIA BROWN, Head Nurse,
Correctional Healthcare Co., and CORRECTIONAL
HEALTHCARE COMPANY                                                       DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and

*in forma pauperis.*  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2013), the Honorable

Susan O. Hickey, United States District Judge, referred this case to the undersigned for the purpose

of making a report and recommendation.

Plaintiff is currently incarcerated in the Grimes Unit of the Arkansas Department of

Correction.  The events at issue in this case occurred while he was incarcerated in the Miller County

Detention Center (MCDC).  Specifically, he maintains his constitutional rights were violated in the

following ways: (1) he was denied adequate medical care; (2) he was subjected to unconstitutional

conditions of confinement; and (3) he was denied access to a law library, legal materials, or a notary.

The case is before me on the motions for summary judgment filed by Defendants.  Separate

Defendants Sheriff Ron Stovall, Jail Warden Marty Brazell, and Maintenance Supervisor Dewyane

Floyd (the MCDC Defendants) have moved for summary judgment (ECF No. 61) on the conditions

of confinement claims and the denial of access to a law library claims.  Separate Defendants Nurse

Brown and Correctional Healthcare Company (the Medical Care Defendants) have moved for summary judgment (ECF No. 66) on the denial of medical care claims. Plaintiff has responded (ECF No. 98) to the motions. The motions are now ready for decision.

## 1. Background

Plaintiff was arrested and booked into the MCDC on February 7, 2012. *Plaintiff's Response* (ECF No. 98)(hereinafter *Resp.*) at ¶ 3. He remained incarcerated there until July 19, 2012.[1] *Medical Defts' Ex.* 1-T. Marty Brazell is the jail administrator. *MCDC Defts' Ex.* A at ¶ 3.

When Plaintiff was booked in, Plaintiff reported that he was a borderline diabetic. *Medical Defts' Exs.* 1 at ¶ 9; 1-E ; *Resp.* at ¶¶ 4 & 36. Plaintiff indicated he had problems with his heart, arthritis, and Hepatitis C. *Medical Defts' Ex.* 1-E; *Resp.* at ¶ 4. Plaintiff did not report having high blood pressure. *Medical Defts' Ex.* 1 at ¶ 11. However, Plaintiff states he did list "heart problems and he believes this statement encompasses high blood pressure." *Resp.* at ¶ 43.

From his diagnosis with Hepatitis C in 1997 through November of 2007, Plaintiff had never been treated for the condition. *Medical Defts' Ex.* 1-B; *Resp.* at ¶¶ 30-31. However, Plaintiff maintains the results of his liver enzyme tests were abnormal and showed both the Aspartate Transaminase (AST) high and the Alanine Transaminase (ALT) were high. *Resp.* at ¶¶ 32-34. Given these readings, Plaintiff maintains he should have been treated while at the MCDC. *Id.*

Nadia Brown is a licensed practical nurse and the Health Services Administrator for Correctional Health Care Company (CHC). *Medical Defts' Ex.* 1 at ¶ 2. CHC provides medical services for inmates house in the MCDC. *Id.*

---

[1] Medical records stemming from what must be other times Plaintiff was incarcerated at the MCDC have been submitted apparently in error. *See e.g., Resp. at Ex.* S (record dated 2/25/11); H (record dated 9/17/13);U (record dated 09/16/13); *see also Medical Defts' Ex.* 1-H (record dated February 22, 2013). Unless otherwise stated, all date references are to the year 2012.

According to Brown, whether to treat a patient infected with the Hepatitis C Virus (HCV) is a matter of medical judgment solely within the discretion of a physician. *Medical Defts' Ex.* 1 at ¶ 6. Plaintiff was given blood tests for the liver enzymes Alkaline Phosphatase, AST and ALT. *Id.* at ¶ 7. "The level of these three enzymes are used as clinical markers fo normal or abnormal liver function." *Id.* All three enzymes were within normal limits on the February 13th test results. *Id.* at 1-C. On the April 9th test results, the Alkaline Phosphatase and AST were within normal limits while the ALT was high. *Medical Defts' Ex.* 1-D. There is no medical evidence presented to suggest these results alone would dictate treatment.

Brown states that she cannot treat HCV without a physician's order. *Medical Defts' Ex.* 1 at ¶ 8. According to Plaintiff, he was told that Miller County and CHC would not treat him for HCV. *Resp.* at ¶ 29.

A hemoglobin A1C is a blood test that measures "the average blood glucose level over a two to three month period." *Medical Defts' Ex.* 1 at ¶ 11. A hemoglobin A1C "level between 5.7% and 6.4% indicates that the patient is at an increased risk for developing diabetes. *Id.* A Hemoglobin A1C level of greater than 6.4% indicates that the patient is diabetic." *Id.* at ¶12. The results of Plaintiff's blood tests indicated he was at an increased risk for developing diabetes but was not diabetic. *Resp.* at ¶ 39. Plaintiff has not been diagnosed with diabetes. *Id.* at ¶ 42.

On February 9th, Plaintiff's vital signs were taken. *Medical Defts' Ex.* 1-F. Plaintiff asked to be started back on the medications he was getting at the jail on prior incarcerations. *Id. Medical Defts. Ex.* 1-I. Plaintiff had not been taking the medications while out of jail but was instead self-medicating with illegal substances. *Medical Defts' Ex.* 1-F; *Resp.* at ¶ 37. He was put on Ibuprofen for thirty days, Parafon forte for muscle pain, and Zantac for acid reflux. *Id.* at 1-I &I-J; *Resp.* at Ex.

L.

On February 16th, Plaintiff was seen complaining of shortness of breath and chest pain. *Medical Defts' Ex.* 1-J.  His vital signs were taken.  *Id.*  An EKG was performed showing normal sinus rhythm and blood tests showed no abnormal findings.  *Id.*  Plaintiff was placed on the next doctor call.  *Id.*

On two occasions Plaintiff exhibited high blood pressure. *Medical Defts' Ex.* 1 at ¶ 14.  The first was on February 24th when his blood pressure was 165/100. *Medical Defts' Ex.* 1 at ¶ 14; *Resp.* at ¶ 44.  Clonidine was administered to reduce his blood pressure. *Medical Defts' Ex.* 1 at ¶ 16; *Resp.* at ¶ 45.  The second time was on February 25th when his blood pressure was 163/99. *Medical Defts' Ex.* at ¶ 17.  On February 29th, Plaintiff was started on the hypertensive drug, Norvasc. *Id.* at ¶ 18; *Resp.* at ¶ 46.  He remained on this medication until his release. *Medical Defts' Ex.* 1 at ¶ 20; *Resp.* at ¶ 46.

On March 26th, Plaintiff complained about swelling in his legs. *Resp.* at ¶ 47.  The following day, he was placed on Lasix, a diuretic used to control edema and high blood pressure. *Medical Defts' Ex.* 1 at ¶ 21; *Resp.* at ¶ 48.  He remained on the Lasix until his release from MCDC. *Medical Defts' Ex.* at ¶ 22; *Resp.* at ¶ 48.

On February 24th,[2] the inmates were put in the pod hallway while Dewayne Floyd used a gas pressure washer to clean the showers.  *Resp.* at ¶¶5-8.  Plaintiff complained of a headache and passed out from the "carbon monoxide" fumes coming from the gas powered washer. *Id.* at ¶ 9. When Plaintiff regained consciousness, he realized that Officer Harris was pressing his knuckles into Plaintiff's chest. *Id.* at ¶ 10 & Ex. B-2.

---

[2]This date is referred to as February 23rd in various places in the record. *See e.g., Resp. at Exs.* B-2 & B-3.

-4-

On February 24th, Brown responded to a call from Max B to check on the Plaintiff.  *Medical Defts' Ex.* 1 at ¶ 23; *Resp.* at ¶ 49.  She found him on the floor.  *Medical Defts' Ex.* 1 at ¶ 23..  "He was awake and alert with no abnormal findings other than a slightly elevated blood pressure."  *Id.* at ¶ 24.  In her affidavit, Brown states Plaintiff was given Clonidine for blood pressure.  *Id.* However, her notes from that day seem to indicate he was only given Ibuprofen  for a headache.  *Id.*; 1-K.

On February 25th, Plaintiff complained that he had developed neck and head pain due to his fall on the 24th.  *Medical Defts' Exs.* 1 at ¶¶ 25-27 & 1-L; .  He was triaged and scheduled for a sick call the following day.  *Medical Defts' Ex.* 1 at ¶ 27.

According to Brown, "[t]he practice of crushing pills was initiated in part because many inmates at the MCDC hoard medications and use the medications for trade and barter.  The decision to administer the pills in crushed form was intended to put an end [to] this practice."  *Medical Defts' Ex.* 1 at ¶ 30.  However, there are certain medications, including a potassium supplement that Plaintiff was taking, that cannot be administered in crushed form.  *Id.*  Plaintiff asserts there were other inmates whose pills were not crushed.  *Resp.* at ¶ 59.  He points out that he was never disciplined for hoarding, trading, or bartering medication.  *Id.*

Brown states that "'[c]linically significant' means that the condition would require the attention of a physician for further follow-up and/or treatment."  *Medical Defts' Ex.* at ¶ 34.  She indicates that the results from the blood tests administered to Plaintiff revealed no clinically significant conditions.  *Id.* at ¶¶ 35-37.

Plaintiff maintains the Defendants violated his constitutional rights by withholding abnormal blood test results from him.  *Resp.* at ¶ 62.  The results were regarded as not clinically significant by

the medical Defendants. *Resp.* at ¶¶ 63-69. Plaintiff maintains the result required "more attention and treatment." *Id.* at ¶ 64.

On March 30th, Plaintiff developed a knot on the right side of his forehead. *Medical Defts' Ex.* 1 at ¶ 38; *Resp.* at ¶ 72. He was assessed by nursing staff and placed on the list to see the doctor. *Id.* He was seen by a doctor on April 4th, and prescribed Metrogel for treatment of the skin condition. *Medical Defts' Ex.* 1 at ¶ 39; *Resp.* at ¶ 73.

On April 4th, Plaintiff was seen by Dr. Nash and prescribed an inhaler. *Resp.* at ¶ 57. Plaintiff believes this was the result of his exposure to carbon monoxide fumes. *Id.*

With respect to his conditions of confinement claims, Plaintiff alleges that he was not provided with cleaning supplies; there was no cleaning solution for the hair clippers; he did not receive clean clothes on a regular basis; the food was served cold; the toilets were not cleaned; odors came out of the drains; food was on the walls; inmates had to stand on a trash can to change television channels; and there was black mold on the shower walls. *Resp. Ex.* D.

Brazell notes that the MCDC has a full-time staff position who does nothing but clean the jail. *MCDC Defts' Ex.* A at ¶ 4. He states that this position was filled during the entire period of time Plaintiff was in the jail. *Id.* The showers are cleaned daily and power washed once a month. *Id.* at ¶ 10. According to Brazell, each pod had its own hair clippers and plenty of cleaning solution was on hand. *Id.* at ¶ 12; *Resp. at* ¶ 19 (Plaintiff agrees there was plenty of cleaning solution for the clippers).

According to Plaintiff, there had not been an officer assigned to see that the cleaning supplies were passed out. *Resp.* at ¶¶ 14-15. Plaintiff states Officer Bryant was assigned to the position but only after Plaintiff submitted grievances. *Id.*

-6-

With respect to the pressure washing, Brazell states Plaintiff is the only inmate, to his knowledge, who ever complained of gas fumes from the pressure washer. *MCDC Defts' Ex.* A at ¶¶ 13-14. Nevertheless, after Plaintiff's complaint, an electric pressure washer was purchased. *Id.* at ¶ 14.

While Plaintiff agrees an electric pressure washer was purchased, he asserts that the gas pressure washer was used a total of three times while he was at the MCDC. *Resp.* at ¶¶ 11-12. On the second occasion, he says a fan was used to blow out the toxic fumes. *Id.* Further, Plaintiff maintains that the pressure washing of the showers did not begin until after he submitted a grievance on February 29, 2012.[3]  *Id.* at ¶ 17.  Moreover, Plaintiff asserts that Brazell never looked at the showers to see if there was mold. *Id.* at ¶ 17.

Brazell indicates the inmates are provided with clean uniforms twice a week. *MCDC Defts' Ex.* A at ¶ 5; *Resp.* at ¶ 21. With respect to the food, Brazell indicates as soon as the food is prepared it is placed in heated carts. *MCDC Defts' Ex.* A. at ¶ 7.  When it is distributed, the carts are unplugged. *Id.*  Brazell estimates that it takes no more than thirty minutes for all of the meals to be distributed. *Id.* at ¶ 8.  If an inmate is in a pod that receives meals last on a given day, Brazell states "it is possible their food may have cooled off a little." *Id.*

Plaintiff maintains that the unplugged carts would be sit in the hallway waiting to be served. *Resp.* at ¶ 23.  During this time, Plaintiff maintains the food became cold. *Id.*  Plaintiff also states that Brazell never checked to see if the food was being served hot or cold. *Id.*

Plaintiff states that he had no access to a law library while at the MCDC. *Resp.* at ¶ 24.  He

---

[3] Plaintiff is apparently mistaken about this date. He maintains he became ill because of fumes from the power washing that took place on February 24, 2012. *See Resp. Ex.* B-1.

notes that MCDC's rules indicate that inmates should have reasonable access to law library materials. *Resp. Ex.* A-2. He further alleges that it took several weeks to get an affidavit notarized. *Id.* at ¶ 25 & *Ex.* E.

Brazell states that Sheriff Stovall has "little involvement in the day-to-day operations of the jail." *MCDC Defts' Ex.* A at ¶ 15. While they do talk regularly about what is going on in the jail, Brazell states he would not bring something as "trivial" as Plaintiff's complaints to the attention of the Sheriff. *Id.* at ¶ 16. Plaintiff maintains that his complaints were not trivial. *Resp.* at ¶ 27.

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

**3. Summary Judgment of the MCDC Defendants** (ECF No. 61)

Defendants maintain they are entitled to summary judgment for a number of reasons. First, they maintain that Plaintiff cannot point to any custom or policy on the part of Miller County which resulted in the violation of his constitutional rights. Second, they argue there is no basis on which Sheriff Stovall can be held liable. Third, Defendants maintain the conditions at the MCDC do not rise to the level of a constitutional violation. Finally, with respect to the library and notary claims, Defendants argue these claims fail because Plaintiff cannot show any actual injury.

**(A). Official Capacity Claims**

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against Miller County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

To establish Miller County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir.2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir.2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the

policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir.2007).

Id. at 817-18.  There must be a direct casual link between the policy or custom and the alleged constitutional violation.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Plaintiff was asked to explain in detail Miller County's policy and how it operated to deprive him of his federal constitutional rights.  *Resp.* at ¶ 1.  He responded: "The practice of employing a individual, Male or Female that engages in a act that violates a amended that protects a person from harm."  *Id.*  In this regard, he maintains the Eighth Amendment was violated.  *Id.*  Similarly, he described Miller County's unconstitutional custom as: "The practice of hiring a individual that engaged in some form of act that violated the Eighth Amendment."  *Id.* at ¶ 2.

These allegations do not suggest the existence of any policy, custom, or practice of Miller County.   A governmental entity cannot be held liable merely because it employs someone who violates an individual's constitutional rights.  *See e.g., L.L. Nelson Enterprises, Inc. v. County of St. Louis, Missouri*, 673 F.3d 799, 811 (8th Cir. 2012)("A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  A municipality can be liable only if a municipal policy or custom caused a plaintiff to be deprived of a federal right.") (internal quotation marks and citations omitted).  The MCDC Defendants are entitled to summary judgment on the official capacity claims.

**(B).  Claims against Sheriff Stovall**

A claim of deprivation of a constitutional right cannot be based on a respondent superior theory of liability.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "The general responsibility . . . for supervising the operation of a [facility] is not sufficient to

establish personal liability." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). "[A] bare allegation that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact in fact with the plaintiff, [or] even an explicit charge of inadequate training or supervision of subordinates, is [not] sufficient to state a [§ 1983] claim." *Id.*; *see also Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

There is no allegation that Sheriff Stovall was involved in any of the actions taken by the other named Defendants. Here, Plaintiff believes his claims were non-trivial and should have been discussed with the Sheriff. However, nothing suggests that happened in this case. In fact, just the opposite is stated. Brazell indicates he did not discuss any of Plaintiff's grievances or claims with the Sheriff. In any event, Sheriff Stovall cannot be held liable on a supervisory liability claim.

### (C). Conditions of Confinement

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same."). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities.

To state an Eighth Amendment claim the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'"

*Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*quoting, Wilson v. Sieter*, 501 U.S. 294 (1991)).

This standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted). *See also Hudson v. McMillian*, 503 U.S. 1 (1992)(The objective component is "contextual and responsive to contemporary standards of decency.")(quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. (citations omitted). *See also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994).

In this case, Plaintiff complains of the following: unsanitary conditions in general; no cleaning supplies; clothes not being laundered often enough; being served cold food; being exposed to fumes from a gas pressure washer on one occasion; there not being cleaning solution for the hair clipper; and black mold in the shower area. However, in his response to the summary judgment motion, Plaintiff states that after he submitted a grievance on February 29th about the unsanitary conditions, *Resp. at Ex.* D, a staff person was assigned to monitor the cleaning. *Resp.* at ¶ 14. He does not dispute that the showers were cleaned daily or that the showers were cleaned monthly using the pressure washer after his February 29th grievance. *Id.* at ¶ 17. There is no suggestion that these measures failed to solve the unsanitary condition of the showers. Moreover, he states that there was plenty cleaning solution available. *Id.* at ¶ 19. With respect to the clothing, Plaintiff admits he was provided with clean uniforms twice a week. *Id.* at ¶ 21.

In regard to the food at the MCDC, the Eighth Amendment requires inmates to be provided

with "nutritionally adequate food." *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). Failure to provide adequate nutrition can constitute deliberate indifference. *Id*. However, in this case, Plaintiff does not maintain that the food was nutritionally inadequate, provided in insufficient amounts, or prepared or served in an unsanitary way. Claims of cold or contaminated food are insufficient unless the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food. No such claims are asserted here. *See Brown-El v. Delo,* 969 F.2d 644, 649 (8th Cir. 1992)(claims that his right were violated when he was served cold food were frivolous).

"[E]xtreme deprivations are required to make out a conditions-of-confinement claims. [O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 9; *Myers v. Hundley* 101 F.3d 542, 544 (8th Cir. 1996); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Plaintiff's claims are clearly insufficient.

**(D).  Denial of Access to Legal Materials and a Notary**

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977)). In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts. To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims. Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that

> a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343 (1996) and *Bounds v. Smith*, 430 U.S. 817 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

In this case, Plaintiff's denial of access to the courts claim fails because he has suffered no actual injury. Plaintiff was able to file this civil rights action and has missed no deadlines imposed by the Court. *See e.g. Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic). Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Merely alleging generally that he was prevented from filing documents because he did not know what arguments to make, has specifically been held to be insufficient to state a claim. *Hartsfield v. Nichols*, 511 F.3d 826, 832 (8th Cir. 2008)(Hartsfield failed to allege he was prevented from filing a complaint, or a filed complaint was dismissed for lack of legal adequacy. He only roughly and generally asserted that he was prevented from filing because

he did not know what arguments to make.  This claim is speculative and was properly dismissed).

While "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate tem, and with stamps to mail them," *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977), Plaintiff must still establish that he suffered an actual injury.  Here, Plaintiff has not alleged any actual injury as a result of the delay in access to a notary.  He does not allege that any case was dismissed or the court refused to consider any document because the document was not notarized. He does not allege he suffered any other harm as a result of his failure to have a document notarized.    *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996)(no actual injury related to copying and notary services); s*ee also, Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)("The underlying harm that the Constitution requires . . . legal assistance programs to prevent is . . . a lost, rejected, or impeded legal claim").  This claim should be dismissed.

### 4.  Summary Judgment of the Medical Defendants (ECF No. 66)

Defendants contend that the facts, taken in the light most favorable to the Plaintiff, do not rise to the level of a constitutional violation.  They argue that there is no evidence of deliberate indifference on their part.  Finally, they argue that there is no policy or custom of CHC that amounts to deliberate indifference to any serious medical need.

To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendant acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v.*

*Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

In this case, Plaintiff maintains he did not receive timely and adequate medical care for his high blood pressure, Hepatitis C, and diabetes.  He also objects to the practice of crushing some of his pills.

With respect to medication for high blood pressure, Plaintiff was prescribed medication on February 29th after his blood pressure was high on two occasions.   When an inmate complains of a delay in treatment, he must show by verifying medical evidence that the delay had a detrimental effect on his health.  *See e.g., Laughlin v. Schiro*, 430 F.3d 927, 929 (8th Cir. 2005).  No such showing has been made here.

With respect to whether or not he should be treated for Hepatitis C, the evidence shows that Plaintiff's liver enzymes were checked on two separate occasions during his incarceration.  On one occasion the results were normal and on another occasion the ALT was high.   Similarly, his blood sugar levels were checked and the result was that he was at an increased risk to develop diabetes but at no time during the incarceration did he develop diabetes.

Whether to prescribe medication for a given condition is a matter of medical judgment.  "[I]nmates have no constitutional right to receive a particular or requested course of treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation."  *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992). Nothing in the summary judgment record suggests that the failure to treat Plaintiff for Hepatitis C or for "borderline diabetes" fell so far below standard medical practices so as to constitute deliberate

-16-

indifference to Plaintiff's serious medical needs.  Moreover, Plaintiff was not receiving treatment prior to his incarceration at the MCDC.

Plaintiff's objection to certain of his pills being crushed is meritless.  There is absolutely no indication that the crushing affected the drug in anyway.

To hold CHC liable for the alleged constitutional deprivations the violation must be the result of a policy, custom, or action by those who represent official policy.  *See e.g., Burke v. N.D. Dep't of Corr. & Rehab.,* 294 F.3d 1043, 1044 (8th Cir. 2002).   Plaintiff has made no such showing here and this claim should be dismissed.

**5.  Conclusion**

For the reasons stated, I recommend that the Defendants' motions for summary judgment (ECF Nos. 61 & 66) be **GRANTED** and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of February 2014.

/s/ Barry A. Bryant_____
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE